**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HALE CONTAINER LINE, INC., Respondent.**

No. 89–2381.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1990.

Decided Aug. 16, 1991.

Warren Malcolm Davison, Littler, Mendelson, Fastiff & Tichy, Baltimore, Md., argued (Benjamin W. Hahn, on brief), for petitioner.

Frederick Lee Cornell, Jr., N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Supervisory Atty., N.L.R.B., on brief), for respondent.

Before PHILLIPS, Circuit Judge, SMITH, Senior Circuit Judge for the Court of Appeals for the Federal Circuit, sitting by designation, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.

## OPINION

EDWARD S. SMITH, Senior Circuit Judge:

Hale Container Line, Inc. (Company) terminated employees Wayne Owens (Owens) and Mark Bull (Bull). In the ensuing grievance proceeding, the National Labor Relations Board (NLRB) held: (1) ship engineer is a statutory "employee" as defined by the National Labor Relations Act; and (2) termination of both employees was directly related to their union involvement. The NLRB ordered the Company to cease and desist from its practices and to reinstate the two employees with back pay. The NLRB applies to this Court for enforcement. We affirm.

### Facts

Hale Container Line, Inc. is a Maryland corporation with its principal place of business in Baltimore. The Company operates two tugboats, *Carol Hale* and *Ashley Hale*, primarily for interstate transportation of containerized cargo.

Prior to July 29, 1986,[1] no Company employees were unionized. On July 19, Michael Efford, captain of the *Carol Hale*, docked the vessel at South Street Seaport in New York Harbor. There, Representative Peter Gale of the International Longshoremen's Association (ILA) approached the crew about unionization. Richard Efford immediately identified himself as management and left.[2] Owens, the ship's engineer, and Michael Efford expressed interest, and Gale returned a few hours later with ILA materials.

During the *Carol Hale*'s return to Baltimore, Owens discussed unionization with other crew members, and Owens, Michael Efford and Bull signed union authorization cards. In Baltimore, Owens obtained the signatures of other employees. When the *Carol Hale* returned to New York, Gale gave additional cards to Bull, who then discussed unionizing with other employees.

On July 29 the ILA filed an election petition with the NLRB. Richard Efford told Owens that the Company's president (Hale) was disturbed by news of the ILA drive. Later the same day, the Company recognized the Marine Beneficial Association, Associated Maritime Officers, AFL–CIO (MEBA), as the representative for its employees. By August 12 the Company had entered into two agreements with MEBA, covering all tugboat personnel.

On July 31 Larry Forsythe, the Company's personnel administrator, granted Bull's previously received request for a leave of absence to attend pilot's school. The same day, Forsythe told Owens of the Company's agreement with MEBA and introduced MEBA Representative Thomas Bethel to the crew of the *Carol Hale*. Bethel informed the crew that they were required to join the union within 30 days or face termination. Both Owens and Bull refused.

Richard Efford flew to Philadelphia on August 1 to check the *Carol Hale*'s reduction gear. On his return August 3, the

---

1. All dates hereafter are in reference to 1986, unless otherwise specified.

2. Richard Efford was temporarily acting as cook until Bull's arrival from Baltimore; Efford's regular position was port engineer.

Company took the *Carol Hale* out of service and laid off the entire crew, including Owens. Bull was also "laid off indefinitely." On August 5 the Company ordered a new shaft.

On August 12, the Company reactivated the newly-repaired *Carol Hale*, due to a mechanical problem with the *Ashley Hale*. Owens was called back to work until August 16, when he was once again laid off. On August 20 Owens was again reactivated for a half day. Throughout this period, Owens refused to support or join the MEBA.

On August 30 Owens signed, under written protest, a MEBA dues payment authorization card. Soon afterwards, he requested an assignment with the Company, stating that he would be available upon completing his Coast Guard exam on September 3.[3] On September 8, the Company gave Owens his final assignment aboard the *Carol Hale*. On September 22, Forsythe mailed Owens a letter, saying that he was terminated, allegedly due to a negative attitude, and that the Company had "lost confidence" in Owens' ability to perform his duties. In protest, Owens filed a grievance against the Company.

On August 17, 1988, an administrative law judge determined that (1) Owens was an employee subject to the benefits of the National Labor Relations Act, and that (2) both Owens and Bull were terminated in direct retaliation for their union involvement.

On December 19, 1988, the NLRB upheld the administrative law judge's prior decision and therefore required the Company to (1) cease and desist from its unfair labor practices and (2) reinstate with back pay both Owens and Bull. The NLRB filed an application with this court for enforcement of its order.

### Issues

Because this is an application for enforcement of an NLRB order, we examine the issues as addressed by the NLRB. We must ascertain whether substantial evidence supports the NLRB's findings that 1) Owens is a statutory employee [4] within the protection of the Act, and 2) Owens and Bull were dismissed for pro-union stances. In both issues, we affirm the NLRB's order for enforcement.

### Supervisor/Employee Classification

■ This court has jurisdiction under Section 10(e) of the National Labor Relations Act (Act).[5] The applicable scope of the Act is limited to "employees," [6] statutorily defined as *excluding* "any individual employed as a 'supervisor'...." [7] Section 2(11) [8] of the Act defines "supervisor" as an individual who has

[A]uthority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, *or* discipline other employees, *or* responsibility to direct them, *or* to adjust their grievances, *or* effectively to recommend such action, if in connection with the foregoing the exercise of such authority is *not* of a merely routine or clerical nature, but requires the use of independent judgment.[9]

An individual qualifies as a supervisor if he maintains *any* of the preceding responsibilities *and* exercises his authority with

---

**3.** Of the various crew members, both the captain and the first mate are required to obtain Coast Guard licenses. The engineer, although not required, generally obtains a similar certification for insurance purposes. Owens, pursuant to this policy, had previously informed the Company that he wished to upgrade his Coast Guard license. Consequently, Owens was required to take an examination.

**4.** *See* 29 U.S.C. § 160(e) (1982).

**5.** 29 U.S.C. §§ 151 et seq., 160(e) (1982).

**6.** *See* 29 U.S.C. § 157 (1982). Under Section 2(3), "[t]he term 'employee' shall include any employee ... and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute...." 29 U.S.C. § 152(3) (1982).

**7.** 29 U.S.C. § 152(3) (1982).

**8.** 29 U.S.C. § 152(11) (1982).

**9.** *Id.* (emphasis added).

"independent judgment" and not merely in a "routine" manner.[10]

Both the *Carol Hale* and the *Ashley Hale* operate with six crew members with specified duties and shifts. The Company's Baltimore office retains centralized management. At all times, the captain is responsible for acting according to instructions received from the Baltimore office. Generally, the crew members use either the ship-to-shore radio or the cellular telephone on board to contact Forsythe, who is authorized to grant leave time. The crew members themselves normally resolve other, minor work-related problems.

■ The engineer's primary responsibility, then, is to perform his own duties, not to oversee the work of others. He is responsible for the tugboat's engines. The engineers retain minimal authority in relation to deckhands, including teaching new deckhands how to check the instruments. An engineer can ask a deckhand for help if he informs the captain, but such a need rarely arises.

On March 12 Owens began working for the Company as an engineer on the *Carol Hale*, and only periodically used any supervisory authority he might have had. During his two daily shifts, Owens generally worked by himself, without requiring the assistance of other personnel. This key fact distinguishes the present case from previous cases. In those cases, the alleged supervisor maintained constant interaction with subordinate employees.[11]

The administrative control maintained by the Baltimore office reaches to the engineer of each vessel. During each trip, the engineer reports directly to the port engineer, and must also tell him whether the deckhands are satisfactorily performing their duties in the engine room.[12] Similarly, the Baltimore office can transfer deckhands without consulting the engineer on duty, although the deckhands may have been assisting the engineer.

We reject the Company's contention that the length of the journeys ("up to twelve days"[13]) and distance from the Baltimore office modify the status of the vessel's engineers. Mere duration does not increase the engineers' authority. Instead, the key factor in evaluation is the harm which could occur without immediate managerial decision-making.[14] The Baltimore office maintains such tight administrative control and supervision via on-board radio and telephone communication as to eliminate all autonomy in either tugboat's crew, a fact inconsistent with such alleged authority in the Company's engineers.

At any given time, either the captain or the engineer is in control of the vessel, and captain and first mate each maintain broader supervisory authority than the engineer. If we accept the Company's contention that engineers are supervisors, then logically, so are both the captain and first mate. This results in a disproportionate number of supervisors to employees,[15] a factor relevant to employee classification,[16] and

**10.** *Id.*

**11.** *See Monongahela Power Co. v. NLRB,* 657 F.2d 608, 613 (4th Cir.1981) (supervisory status attained where individual maintains "constant interaction" with other employees during emergency situations, and such emergencies constituted large portion of average work day).

**12.** The Company presented no evidence to support its contention that these reports had a direct bearing upon the future employment status of any deckhand.

**13.** The average trip lasted between two and twelve days.

**14.** *See Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347, 361 (1st Cir.1980) (individ-

uals at nuclear power facility found to be supervisors due to "potentially devastating effects" of faulty decision-making).

**15.** Under the classification structure tendered by the Company each vessel's crew would consist of three "supervisors" and three "employees."

**16.** *NLRB v. McAllister Bros., Inc.,* 819 F.2d 439 (4th Cir.1987). The substantive value of this factor overrides the classification of crew members under the subsequent MEBA agreement. According to the MEBA agreement, all captains, first mates, and engineers were classified as supervisory personnel. Such a classification is not consistent with the circumstances of this case.

makes us reject the Company's position that engineers are supervisors.

Although the issue need not be addressed, we briefly consider the Company's assertion that Owens *maintained* the authority of a supervisor. However, this is insufficient; evidence must indicate that "the alleged supervisor knew of his authority to exercise."[17] Evidence shows instead that Owens was unaware of any such capacity he might have had. In four months of employment, Owens was never so informed, and the issue arose only when the Company named the MEBA as the employees' official representative.

Owens' lack of authority shows also in the fact that other crew members did not regard him as a supervisor.[18] Deckhands usually defer to the captain, first mate, or port engineer when a problem arises. If Owens found a mechanical problem during a trip, he usually contacted Port Engineer Efford. Also, he did not often recruit the assistance of deckhands without prior authorization.[19]

For these reasons, we find that Owens does not qualify as a supervisor,[20] and he is entitled to protection under the Act.

### Application of Section 8(a)

■ Under Section 8(a) of the Act,[21] it is an unfair labor practice for an employer to (1) "interfere with, restrain, or coerce employees in the exercise of the right[]" to organize or collectively bargain with labor organizations;[22] or (2) discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...."[23] It is well established that an employer violates section 8(a) by retaliating against employees for union activities.[24] The key factor is the employer's motive,[25] determined by circumstantial and direct evidence.[26] Since it is a question of fact, courts usually defer to the findings of the NLRB as long as there is sufficient evidence to sustain the findings.[27]

The record shows that Hale is also principal owner and president of Port East Transfer (Port East), a trucking company which operates in conjunction with the tugboat line, with operations integrated in the Baltimore office. The Company's vice president, personnel administrator, and port captain are managers in both companies.

In 1986 the NLRB found that Port East violated the Act by discriminatorily discharging an employee advocating unionization.[28] During the course of that hearing, sufficient evidence established Hale's anti-union stance,[29] and is admissible back-

---

**17.** *NLRB v. Tio Pepe, Inc.,* 629 F.2d 964, 969 (4th Cir.1980).

**18.** *See NLRB v. First Union Management, Inc.,* 777 F.2d 330, 335 (6th Cir.1985); *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1064 (4th Cir.1982).

**19.** *See NLRB v. Southern Bleachery & Print Works, Inc.,* 257 F.2d 235, 239 (4th Cir.1958) (skilled employee not supervisor where managerial capacity limited to "the control [exercised by] a skilled worker over less capable employees ..."), *cert. denied,* 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959).

**20.** As additional support for our conclusion we note that on May 7, 1987 the ILA was certified by the NLRB as the Company's official employee representative. The contract classified all tugboat personnel as *nonsupervisory* employees.

**21.** 29 U.S.C. § 158(a) (1982).

**22.** 29 U.S.C. § 158(a)(1) (1982).

**23.** 29 U.S.C. § 158(a)(3) (1982).

**24.** *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 400–03, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983).

**25.** *NLRB v. Instrument Corp. of Am.,* 714 F.2d 324, 328 (4th Cir.1983) (employer must be "motivated by purpose of discouraging union activities" to violate section 8(a)).

**26.** *See Jeffrey Mfg. Div. v. NLRB,* 654 F.2d 944, 948 (4th Cir.1981).

**27.** *NLRB v. Air Prod. and Chem., Inc.,* 717 F.2d 141, 145 (4th Cir.1983).

**28.** *Port East Transfer, Inc.,* 278 NLRB 890 (1986).

**29.** The NLRB found that Hale described organizers as a "cancer," and that he didn't want "any union people working for [him]." *Id.*

ground evidence concerning the Company's motive in dismissing Owens and Bull.[30]

### Termination of Owens

■ On July 22, Michael Efford told Vice President Gartrell at the Baltimore office of the union representative's approach to Owens and the Effords. Gartrell ordered Michael Efford to collect the literature before other employees could view it.[31] Although the Company took the *Carol Hale* out of service and laid off the crew on August 3, purportedly due to a mechanical problem with the vessel's reduction gear, the record shows that the *Carol Hale* was operational on August 3 and had been in basically the same condition for several months. This sudden change, which required laying off an entire crew, signals possible ulterior motives.[32] Substantial evidence indicates that this mechanical problem was merely a cover for the Company's true retaliatory purpose.

The Company's retaliatory motive for taking the *Carol Hale* out of service shows in statements Port Engineer Efford made before inspecting the vessel. Efford told the crew of the *Ashley Hale* that Hale told him to "find something wrong with the reduction gear" on the *Carol Hale*. He

said that "Hale was pretty ticked off" at the crew of the *Carol Hale* for signing authorization cards with the ILA. Combined with the Company's abrupt change in practices, these statements sufficiently identify the Company's discriminatory intent in its treatment of Owens and Bull.[33]

With discriminatory motive established, we address the illegality of the Company's subsequent treatment. of Owens. While the *Carol Hale* was nonoperational, the Company reapportioned the available work among all crew members except Owens. After August 3, the Company systematically reduced assignments to Owens,[34] giving them instead to either the senior engineer, Dave Wigley,[35] or a substitute engineer, Robert Kozojet.[36] Such treatment further shows the Company's discriminatory intent.[37]

The record contains additional evidence of the Company's retaliatory purpose in denying Owens work; if reduced work forced Owens to quit, any ILA support would be substantially reduced. These efforts culminated in Owens' final assignment with the Company on September 8: a one-way trip to Norfolk which required Owens to find his own transportation back to Baltimore. On the morning of September 9 the *Carol Hale* arrived in Norfolk. Owens

**30.** *Maphis Chapman Corp. v. NLRB,* 368 F.2d 298, 303 (4th Cir.1966) (prior anti-union statements admissible for purpose of showing employer's motive).

**31.** Gartrell was unaware that the other employees had already viewed the literature.

**32.** *Birch Run Welding & Fabrication, Inc. v. NLRB,* 761 F.2d 1175, 1181 (6th Cir.1985) (employer's variance from established past practices admissible to indicate anti-union motive).

**33.** The Company's discriminatory motive is further indicated by the fact that on July 31 Company Personnel Administrator Forsythe informed Owens that Hale was "against all unions," but had selected the MEBA as a more acceptable alternative.

**34.** Between August 16 and September 22, Owens was given only about two days' work.

**35.** The Company attempted to justify its uneven distribution of assignments on the basis that Wigley had specifically requested the additional

workload. However, Wigley admitted that he was willing to allot a portion of his assignments to Owens.

**36.** A member of the MEBA, Kozojet was hired temporarily as a substitute for Wigley, who had requested some time off work during the first week of September. When Kozojet asked Port Engineer Efford why Owens was not given a September 2 assignment, Efford replied that Owens had made a grave mistake by getting involved with the ILA. Accordingly, we reject the Company's assertion that Owens was unable to accept the September 2 assignment because of his Coast Guard exam on September 3. On the contrary, these facts are additional indicia of the Company's discriminatory practices. The Company led Owens to believe that he could indeed do both, and only indicated otherwise upon Owens' insistence.

**37.** *See American Thread Co. v. NLRB,* 631 F.2d 316, 322 (4th Cir.1980) (employer's "glaring disparity" in treatment of employees evidence of unlawful motive).

did not work the remainder of the day.[38] Forsythe specifically required Owens to ride back on a bus. At 7:00 p.m. Richard Efford [39] finally drove Owens to the bus terminal.[40] At 2:00 a.m. the next day, Owens arrived in Baltimore.[41] Unable to locate a taxi, Owens arranged for his son to take him home.[42] Owens did not work for the Company again.

Because the Company's stated policy of requiring employees to use the least expensive available transportation was not routinely applied on a practical level, this seems to be simply another in a series of actions designed to harass Owens into resigning.

On September 10, Owens sent Forsythe a letter requesting reimbursement for his bus fare; he also reiterated a previous request for written verification of his hours worked for the Company, as required for his Coast Guard license.[43] Later in the day, Owens sent a second letter to Forsythe, requesting $10 as reimbursement for his son's travel-related expenses.

The Company thereupon terminated Owens' employment, attempting to justify its actions by saying that Owens had a defiantly negative attitude.[44] However, Owens' negative attitude towards the Compa-ny was a direct consequence of his previous treatment.

Under the express language of the Company-solicited MEBA agreement, which classified engineers as "officers," all officers were entitled to reimbursement for reasonable travel expenses between the destination and the home port. The Company thus placed itself in an untenable position: it recognized the MEBA as the employees' official representative, but then failed to abide by the terms of its own agreement.

In addition, the Company's rationale for firing Owens conflicts with its own recognition of Owens' past performance. In a letter to the Coast Guard, the Company called Owens a "superior" employee who showed "enthusiasm and dedication" to his work.[45] Owens' two letters seem merely an excuse for his dismissal.[46]

■ Even assuming arguendo that the Company actually discharged Owens due to his attitude, the termination would still be unlawful. Owens had a contractual right under the terms of the MEBA agreement with the Company; he was merely attempting to enforce it. The Company would therefore still be in violation of section 8(a) for its discriminatory purpose in terminating Owens' employment.[47]

38. Two crew members, Owens and deckhand Malinowski, needed transportation back to Baltimore. The Company allowed Malinowski to be a passenger in a tractor-trailer, owned by the Company, headed for Baltimore.

39. Efford, the port engineer, was attempting to repair the *Ashley Hale*, which was in Norfolk at the time.

40. Because Efford stated that he did not have a Company credit card, Owens was required to obtain his own bus fare.

41. The trip, taking over seven hours by bus, would have taken less than five hours by car.

42. The following morning Owens' son also took him to the dock where Owens' car was located.

43. Unbeknownst to Owens, the verification letter had already been sent directly to the Coast Guard on September 4. Owens had specifically requested that the Company send the letter directly *to him*.

44. In his letters Owens specifically requested that the Company expeditiously reimburse him for his prior travel-related expenses. Although there is little doubt that the first letter carried sarcastic overtones, it contained neither abusive nor profane language.

45. *See NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 968 (4th Cir.1985) (employer's "proffered justification" for termination of employee merely "pretextual" where employee was considered valuable prior to union activity); *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir.1984) (employer's "implausible" explanation indicates unlawful motive for discharge of employee).

46. Shortly after his discharge, Owens was informed by Richard Efford that the Company was pleased with the quality of his work performance, and had fired him under false pretenses.

47. *See NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 830–36, 104 S.Ct. 1505, 1510–14, 79 L.Ed.2d 839 (1984); *Community Hosp. of Roanoke, Inc. v. NLRB*, 538 F.2d 607, 610 (4th Cir.1976).

### Termination of Bull

 Bull was a cook aboard the *Carol Hale*. Bull's first conflict with the Company was on July 31, following the *Carol Hale*'s departure from New York. On that day, Hale met Bull aboard the *Carol Hale* and asked him about the prior meeting with ILA Representative Gale.[48] On August 5, Bull was informed that he had been "discharged."[49] Forsythe said that Bull had previously lied to Hale and that it would therefore be "bad business practice" to keep him on.

Because the alleged lie dealt with Bull's union activity, it is consistent to view Forsythe's statement in light of his earlier actions. Thus, it is permissible to interpret Forsythe's statement as virtual admission that the Company discharged Bull because of his union activities:[50] it is further evidence that the Company was actively attempting to rid itself of Owens and Bull.[51] Such evidence overrides any inference from the Company's failure to discharge *all* union activists,[52] especially since the fate of Owens and Bull warned remaining employees that such activities would not be tolerated in the future. The Company violated the provisions of the Act through its dismissal of Bull, as it did with Owens.

### Conclusion

Substantial evidence supports the NLRB's finding that Hale Container Line, Inc. has committed unfair labor practices by violating Section 8(a)(1) and (3) of the National Labor Relations Act. The record supports the conclusions that Owens, a ship engineer, is an "employee" within the meaning of section 2(3) of the Act, and that the termination of both Owens and Bull was retaliatory in nature, due to their previous union activities. The Company is ordered to cease and desist from its discriminatory practices and to reinstate both employees with back pay. The National Labor Relation Board's application for enforcement of its order is granted.

ENFORCEMENT GRANTED.

---

**48.** Although Bull initially denied having any knowledge of the authorization drive, Hale was adamant in his interrogation.

**49.** Forsythe subsequently prepared a "termination record," and informed Bull that "he may be considered for future employment."

**50.** *L'Eggs Prod., Inc. v. NLRB*, 619 F.2d 1337, 1343 (9th Cir.1980) (threat by employer to "get rid of" union activist equivalent to confession of discriminatory purpose).

**51.** The Company's contention that Bull was relieved so he could attend navigation school is unsubstantiated. This is consistent with the hearing examiner's findings at Bull's state unemployment compensation proceeding. The examiner determined that Bull did not merely quit or resign. Accordingly, Bull was *held to be entitled to unemployment compensation benefits.*

**52.** *See NLRB v. Instrument Corp. Of Am.*, 714 F.2d 324, 330 (4th Cir.1983) ("discriminatory motive, otherwise established, is not disproved by an employer's proof that it did not weed out all union adherents ..." (quoting *Nachman Corp. v. NLRB*, 337 F.2d 421, 424 (7th Cir. 1964))).