14 F.3d 594
 145 L.R.R.M. (BNA) 2072
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
FAIRFAX HOSPITAL, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
DISTRICT OF COLUMBIA NURSES ASSOCIATION, Respondent-Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FAIRFAX HOSPITAL, Respondent.
 Nos. 93-1467, 93-1272.
 United States Court of Appeals, Fourth Circuit.
 Dec. 8, 1993.
 
 On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board.
 Paul M. Lusky, John G. Kruchko, McLean, VA
 Nancy Barbara Hunt, Jerry Hunter, Yvonne T. Dixon, Nicholas E. Karatinos, Aileen A. Armstrong, Howard E. Perlstein, Washington, DC
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and WILKINSON and HAMILTON, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Fairfax Hospital (Fairfax or Hospital) appeals the [January 29, 1993] order of the National Labor Relations Board (the Board) charging Fairfax with unfair labor practices. The NLRB has cross-applied for enforcement of the order. Adopting the order of the Administrative Law Judge (ALJ), the Board concluded that Fairfax violated the National Labor Relations Act (the Act), Section 8(a)(1), (3), 29 U.S.C. Sec. 158(a)(1), (3). For the reasons stated herein, enforcement of the Board's order is granted.
 
 
 2
 * A. Background Facts
 
 
 3
 In the summer of 1988, the District of Columbia Nurses Association, American Nurses Association (Union), after being contacted by registered nurses (RNs) at the Hospital, began an organizing campaign, which led to the formation of the Fairfax Professional Nurses Association (FPNA). Nurses from various units of the hospital composed the steering committee of the FPNA. The FPNA contacted the Union and affiliated with it.
 
 
 4
 After the Hospital learned of the organizing effort in September 1988, it pursued a policy of interfering with the Union's ability to promote itself. In response to the organizing campaign, the Hospital pursued two approaches. Besides promulgating new rules, the Hospital proceeded to enforce existing rules differently than it had in the past.
 
 B. The Rules
 1. The Bulletin Board Rule
 
 5
 One of these rules, in effect since 1984, concerned the posting of materials on hospital bulletin boards.[1] Until the fall of 1988, most of the nurses were unaware of the rule because it had previously been almost completely ignored. After the Hospital discovered the organizing drive, however, Lloyd Greene, the Hospital's Assistant Administrator for Human Resources, met with supervisors and supervisory nurses and advised them to enforce the rule.
 
 
 6
 The rule was not applied uniformly. Although the rule required prior approval for all postings, nurses rarely sought approval from the personnel office before placing nonhospital-related postings on the board. In particular, testimony established that employees constantly posted, without prior approval, notices and sign up sheets for various parties, baby showers, luncheons, and happy hours; sales of gift wrapping paper; Girl Scout cookies; Avon products; shoes; and cars. The supervisors removed the nurses' Union-related postings, but they allowed "social" postings to remain.
 
 2. The Mailbox Rule
 
 7
 In mid-February 1989, RN Kathleen Eisenhauer placed copies of a Union meeting flyer in nurses' mailboxes. Operating Room Nurse Coordinator Rosalie Ewing removed the flyers from the mailboxes and informed Eisenhauer that solicitation and this type material were not allowed in the hospital. None of the nurses had heard of this "Rule." In prior years, nurses had used the mailboxes for any correspondence which they wished to share with others, including personal telephone messages, Christmas and birthday cards, thank-you notes, invitations to showers and parties, notices of sales of Avon products and Girl Scout cookies, photographs, videotapes, and raffle tickets.
 
 
 8
 On March 3, 1989, the Hospital promulgated the following new rule:
 
 
 9
 The internal mailboxes for employees are the Hospital's property. These mailboxes are made available to facilitate in-house communication on matters directly related to Hospital operations and practice. Therefore, material concerning outside matters, such as picnics, fund raising, etc., may not be placed in the mailboxes.
 
 
 10
 Only hospital-related material that a Department Head or his/her designee, places in the in-house mailboxes is permitted. Any written material that is not hospital-related or is placed in the mailboxes by someone other than a Department Director/Nursing Coordinator will be removed from the mailboxes. Any employee who is found to violate this policy will be subject to disciplinary action.
 
 
 11
 (J.A. 1287). Even after the rule was promulgated, the nurses continued to receive nonhospital-related material in their mailboxes; however, the only items ever removed were Union literature.
 
 3. The Personal Appearance Policy
 
 12
 The next rule of relevance in this case is the Hospital's personal appearance policy. The Hospital had a rule since 1986 which permitted the wearing of "[p]rofessional pins ... or those authorized by Administration," but prohibited the wearing of other "pins, badges, insignia, buttons, signs, etc." (J.A. 53). This policy was rarely enforced. RNs wore a variety of buttons such as Redskins' buttons, Christmas buttons, humorous buttons, and National Nursing Day buttons.
 
 
 13
 On April 17, 1989, the Union distributed to its supporters a button which read, "Nurses: Let's Work Together, FPNA/DCNA" (J.A. 54). The pin showed clasped hands. The same day, the Hospital promulgated and distributed to employees the following new rule:
 
 
 14
 All Association employees must wear an authorized name tag while on duty. Only professional pins, service pins may be worn in immediate patient care dress [sic].
 
 
 15
 Id. Starting that afternoon, the Hospital informed the nurses that they could not wear their Union buttons and that the policy against the wearing of unauthorized buttons would be strictly enforced. Further, the Hospital warned the nurses that any violation of the policy would necessitate disciplinary action. The policy was enforced immediately. Some nurses were given formal warnings--the first step in the Hospital's positive disciplinary process--for wearing the buttons. Other nurses were instructed to remove their buttons immediately.
 
 
 16
 The prohibition against all nonconforming buttons did not last long. Nurses soon returned to wearing a variety of buttons, including Redskins' buttons, teddy bears, and holiday pins. The prohibition against Union buttons continued, however, and employees seen wearing Union buttons were ordered to remove them.
 
 4. The Off-Duty Access Rule
 
 17
 The Hospital also promulgated an "Off-Duty Employee Access Rule"[2] in the fall of 1988 after the organizing campaign began. The Hospital, however, failed to follow its normal method for disseminating the new rule to employees. Typically, the Hospital advised employees of new rules by issuing a memorandum; it also placed new policies in communications and policy books which were maintained in the various units and were announced by the nursing coordinators at staff meetings. Here, the Hospital did neither.[3]
 
 
 18
 Most of the nurses, with some exceptions, were unaware of the existence of the rule. RN Jan Hylton found out about the rule in mid-October 1988 when she returned to work while off duty to distribute some information about collective bargaining. Hylton knew about the solicitation policy which permitted solicitation in certain areas during nonworking time; she did not know about the off-duty access rule. Director of Surgical Nursing, Karen Lemieux, told Hylton that if she was soliciting, then she would have to leave. Lemieux directed Hylton to the staffing office to read the new off-duty policy. Although the Hospital usually did not post policies in that office, Hylton found the Off-Duty Access Rule posted there. The next day, the rule appeared in the unit communications and policy books for the first time. Other nurses testified that they first discovered the rule when they saw it posted later in November 1988, or when they saw it lying on a table after it had been posted in the summer of 1989. Some nurses did not learn of the rule until they heard about it from the nurses disciplined in April 1989, see infra.
 
 
 19
 On April 20, 1989, RNs Eisenhauer, Muller, and Dorothy Vasilcheck distributed Union leaflets. Muller was on a public sidewalk; Eisenhauer and Vasilcheck were leafletting in parking lots of the Hospital. Security guards approached all three of the nurses, asked them what they were doing, and wrote down their names. Shortly thereafter, Mary Jane Mastorovich, Associate Director of Nursing, told Eisenhauer and Vasilcheck that they were not allowed to distribute leaflets. Eisenhauer responded that, according to the solicitation rule, they were in the correct place. Mastorovich then asked Eisenhauer whether she had worked that day. When Eisenhauer replied that she had not, Mastorovich said that she was in violation of the no-access rule and again asked her to leave. Although both nurses refused to leave, they remained only ten more minutes.
 
 
 20
 The following day, Fairfax gave the three nurses written warnings, each of which stated that it constituted the second phase of the disciplinary process. The warnings indicated that additional violations could lead to further disciplinary action. Neither Eisenhauer nor Vasilcheck had ever been disciplined before.
 
 
 21
 While scrupulously enforcing the no-access rule against nurses who returned to participate in Union activity, the Hospital declined to enforce the rule against nurses who returned to the Hospital to participate in other activities. Off-duty nurses continued to return to the Hospital without incident to attend baby showers, parties, luncheons, social, and athletic events; to pick up products they had purchased; to conduct business in the credit Union; and to use the Hospital's library.
 
 5. The Solicitation and Distribution Rule
 
 22
 Fairfax also applied its solicitation and distribution rule to thwart the efforts of the Union. Since November 1986, the Hospital had a policy prohibiting employees from soliciting or distributing literature for any purpose during working hours on hospital premises. The rule specifically prohibited solicitation in patient care areas.[4] The Hospital did not restrict solicitation by off-duty employees in cafeterias, lobbies, gift shops, lounges, locker rooms, rest rooms, and parking lots.
 
 
 23
 The rule noted that disciplinary action would result from noncompliance.
 
 
 24
 The Hospital did not strictly enforce the rule. For instance, the rule did not restrict solicitation in the Hospital's cafeteria, but the rule prohibited solicitation in the meeting room adjacent to the cafeteria. Nevertheless, numerous "social" activities[5] were held in this room, and discipline was never imposed. Moreover, employees were never disciplined for selling and advertising a variety of products throughout the Hospital in open view of patients in specifically prohibited areas.[6]
 
 
 25
 Even though the rule allowed solicitation and distribution in the nurses' lounges during nonworking hours, nurses were warned not to distribute prounion literature there. In fact, Nursing Coordinator Jonathan Hurwitz told RN Tina Price that she was not allowed to bring any Union literature into the hospital. On the other hand, while the Hospital allowed nonunion material to remain posted in the lounges, any Union material was quickly removed.
 
 
 26
 In addition, the Hospital published numerous antiunion posters for bulletin boards; it also printed smaller versions for handouts. Some of these were titled "The Truth About Unions" or"Why Fairfax Nurses Oppose the Union." The Hospital, without being specific about when or where the material should be handed out, advised the nursing coordinators to make sure that every nurse received a copy of the anti-union literature. (J.A. 174-76). Nonetheless, the Hospital distributed the antiunion literature in the very patient care areas where the rule prohibited solicitation and distribution of any kind.[7] For example, RN Becky McFadden handed out the flyer The Truth About Unions at the nurses' stations. (J.A. 141-45). RN Janet Courtemanche was given antiunion material at the nurses' station while she was on duty in the Coronary Care Unit II (J.A. 692); RN Garrity admits distributing antiunion material at the nurses' station. (J.A. 1042-44). None of these incidents resulted in discipline.[8]
 
 
 27
 In contrast, any distribution of prounion literature in prohibited areas resulted in discipline. For example, on December 4, 1989, Nursing Coordinator Director Marianne Heberer suspended for one day of "decision-making leave" RNs Vasilcheck and Vicki Herman for violating the rule. (J.A. 22). The incident resulting in discipline occurred during the night shift on November 13-14. Vasilcheck and Herman went into the cubbyhole, a small open area off the nurses' lounge, and an area where nurses would regularly take their break on the night shift, despite the fact that it was also used by the nurses for charting and documentation work, paging people, and making phone calls. RN Tracy Maslyn, who was pregnant, was charting in the cubbyhole. After engaging in a conversation about maternity benefits, Vasilcheck and Herman asked Maslyn whether she would be interested in reading about the Union. When Maslyn responded affirmatively, Herman gave her a Union authorization card and flyer. The conversation ended, and all three returned to work. Vasilcheck then noticed that Maslyn had left the Union literature where she had been sitting; she brought the literature to Maslyn, who was standing near the nurses' station, and told her to take the information to read later. When Heberer eventually heard about the conversation and the distribution of Union material, the disciplinary decision-making leave followed.
 
 
 28
 Ironically, the Hospital participated in the same type of distribution for which Vasilcheck and Herman were disciplined. Several months later, on March 1, 1990, RN Heberer gave Vasilcheck one of the Hospital's antiunion flyers in the same cubbyhole, while Vasilcheck was charting. (J.A. 436-39). Again, no discipline resulted.
 
 C. The Surveillance
 
 29
 Besides promulgating and disparately enforcing new rules, Fairfax responded to the Union's organizing efforts with surveillance. From 5:30 a.m. to 7:30 p.m. on May 5, 1989, approximately thirty nurses and other Union supporters distributed packets of Union materials around the perimeter of the Hospital. Some of the supporters were carrying balloons, but none wore signs. The Hospital knew in advance that Union activity had been planned: at 2:00 a.m. on May 5, the Hospital had been made aware of some Union literature which stated that nurses, who would be standing on county sidewalks and roads adjacent to Hospital entrances, were going to hand out authorization cards and other literature.
 
 
 30
 Lloyd Greene, the Hospital's Assistant Administrator for Human Resources, hired photographers to photograph and videotape the participants. Greene, along with Tim Klagholz, the Hospital's Director of its Media Services department, and the photographers, drove around the Hospital premises taking pictures for about an hour. Many of the pictures were made with telephoto lenses, often at the direction of Greene, who pointed out the specific leafleteers he wanted photographed. Klagholz and one of the other photographers returned later in the day to make more photographs and videotapes. Greene also stationed a video camera at the Hospital's main entrance to tape the leafleteers. Moreover, the Hospital's security guards were instructed to observe the leafletting all day. Nursing Directors Kathleen Garrity and Karen Lemieux also rode in other vehicles in order to observe the Union activity.
 
 D. The Discharge of Kitty Richardson
 
 31
 Finally, the Hospital discharged RN Katherine (Kitty) Richardson on March 8, 1990. Richardson, who had twenty-seven years' experience as an RN, sixteen of those years at Fairfax, worked as a certified staff RN in the hemodialysis unit at the Hospital. She was also the sole nurse in her department certified in nephrology. During her tenure with Fairfax, Richardson received consistently excellent evaluations which often rated her performance as "superior" and "outstanding." After being strongly recommended for a promotion to the Clinical Ladder, her promotion to Clinician III had been approved.
 
 
 32
 In her sixteen years with the Hospital, Richardson had been neither disciplined nor counseled. Fairfax had nominated her for "Outstanding Nurse of the Year" in 1988. That nomination, which praised her public speaking, her positive influence on her peers, and her role as a patient advocate, went to the Virginia State Nurses Association. Besides retaining membership on the Hospital's protocol committee, Richardson did extensive teaching at the Hospital in the areas of hemodialysis and nephrology.
 
 
 33
 In the spring of 1989, Richardson announced her support for the Union in a Union flyer distributed outside the Hospital. The flyer contained a prounion quote from Richardson and a photograph. She then joined the FPNA's steering committee, a group of approximately 20 nurses active in the organizing efforts from various departments in the Hospital. As a member of the steering committee, Richardson spoke about the Union, attended meetings, and distributed flyers outside the Hospital. Mastorovich, Toni Ardabell--the Director of Medical, Psychiatric and Dialysis Nursing--and Kathleen Garrity--the Director of Critical Care and Surgical Nursing--observed Richardson while she was leafletting.
 
 
 34
 On the morning of March 7, 1990, while on a break in the break room, Richardson, fellow nurse Linda Ensign, and their supervisory nursing coordinator Terri Booth, were discussing an antiunion poster the Hospital had posted. Janet Steuber, another nurse, overheard parts of the conversation.
 
 
 35
 The poster in question, which had been posted in the break room and in other locations throughout the Hospital, such as the nurses' bathroom, was part of the Hospital's series of posters on "Why Fairfax Nurses Oppose the Union." This particular poster detailed an ugly event in which an operating room nurse allegedly told a patient that he would not receive good medical care because his wife refused to support the Union.
 
 
 36
 In the conversation between Richardson and Booth in the break room, Richardson told Booth that she doubted the truthfulness of the poster and stated that in all her years of nursing she had never seen conduct like that described in the poster. Booth responded that she believed the poster. Richardson then questioned Booth about the reasons for hanging the poster in the nurses' bathroom in addition to posting it on the bulletin board. Booth replied that the Hospital owned the entire facility and could post its material wherever it wished. Richardson responded that prounion nurses should also be able to post their notices in support of the union.
 
 
 37
 The break was nearing an end. When Richardson and Ensign got up to leave, Booth commented to them that the Hospital's posting was unpleasant for everyone and that the situation would probably worsen. Booth stated, "You better get used to it because there will be a lot more of these things coming." (J.A. 67). Richardson replied that Booth could expect "retaliation." Id. During the conversation, Richardson's voice was "firm" and "a little louder than ordinary conversation," but she did not scream or approach Booth, raise her arms, "or anything." (J.A. 1234-35).
 
 
 38
 That same morning, Booth informed Ardabell about her conversation with Richardson and told her that Richardson had threatened her with "retaliation." After assuring Booth that she would discuss the matter with Mastorovich, Ardabell told Booth that she would get back in touch with her. The same day, Mastorovich met first with both Booth and Ardabell together, then with Ardabell separately. Although Mastorovich concurred with Ardabell's recommendation that Richardson be fired, Mastorovich instructed Ardabell to speak with Ensign.
 
 
 39
 Later that afternoon, Ensign met with Ardabell and Booth. Ensign described the entire conversation and emphasized that the whole discussion was about an antiunion poster. She stressed that Richardson never yelled during the encounter. Moreover, she commented that she did not believe that Richardson had used the word"retaliation" to threaten Booth. In fact, Ensign stated that she did not believe that Richardson would threaten anyone. She added that she did not think Richardson had threatened Booth.
 
 
 40
 During the meeting, Ardabell composed a statement for Ensign's signature. At first, Ensign refused to sign the statement because she disagreed that it accurately reflected the events of the Richardson/Booth conversation. Eventually, Ensign signed a revised statement because, she contends, she felt pressured to sign something and did not feel free to leave the room until she did so.[9]
 
 
 41
 Ardabell again met with Mastorovich after meeting with Ensign. Ardabell incorrectly told Mastorovich that Ensign had confirmed Booth's version of the events. Mastorovich, agreeing with Ardabell's continued recommendation of termination, approved Richardson's termination without speaking to Richardson. In making her decision to discharge Richardson, however, Mastorovich did consult with Charles Barnett, the Hospital's Chief Operating Officer, Brent Miller, Vice-President for Human Resources, and the Hospital's legal counsel. Barnett and Mastorovich decided to terminate Richardson the next day for threatening Booth with unspecified retaliation.
 
 
 42
 When Richardson arrived at work the next day, March 8, 1990, at around 8:00 a.m., she changed into her work clothes. Ardabell located her and escorted Richardson from her locker to the office of Lou Segner, Manager of Employee Relations and Training. Ardabell informed Richardson that Booth had approached her the day before and had accused Richardson of threatening her. After Richardson related her recollection of the breakroom conversation with Booth and Ensign, Ardabell stated that Richardson had threatened Booth with retaliation. Richardson then rolled her eyes and attempted to explain that she had used the word "retaliation" in reference to other postings that the Union might make. Responding that Booth had a different impression of what had transpired, Ardabell discharged Richardson.
 
 
 43
 Segner then requested Richardson to turn over her identification badge and the keys to her unit. Ardabell and Segner accompanied Richardson back to her unit to clean out her locker and escorted her out of the Hospital.
 
 
 44
 At around 9:00 a.m., Ardabell made an announcement to the staff nurses in Richardson's unit that Richardson had been terminated. Several moments later, Steuber told Ardabell that if Richardson had been fired for the comment she had heard her make to Booth the previous day, Steuber did not consider the statement either threatening or a basis for discharge. Ardabell made no response.
 
 
 45
 The Hospital's disciplinary system, established in 1986, was in effect at the time that Richardson was discharged. The policy set forth three categories of employee violations. Category A violations[10] mandate the use of the positive discipline system. For Category A violations, the steps in the process are: (1) factfinding, (2) oral reminder, (3) written reminder, (4) decision-making leave, and (5) planned discharge.
 
 
 46
 The only violations which can result in immediate discharge are Category B violations. These include theft, use or possession of alcohol or controlled substances while on duty, assault and battery, possession of a dangerous weapon, abuse in caring for a patient, and unauthorized disclosure of confidential information. Even for a Category B offense, however, an employee must first be placed on suspension without pay while the Hospital conducts an investigation before the employee can be discharged.
 
 
 47
 Category C violations, which include reduced attendance or productivity deriving from physical or mental disability, result in appropriate referral for treatment or assistance.
 
 
 48
 The consolidated complaint in this proceeding alleges that, when District of Columbia Nurses Association, American Nurses Association (Union), began to organize the registered nurses employed by Fairfax Hospital, the Hospital instituted or began to enforce no solicitation, no distribution, no access, no buttons, no posting, and mailbox rules, some disparately, in order to prevent and frustrate the Union from organizing. The Union was the charging party before the Board. The complaint alleged that the above-referenced rules violated Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1). In an order dated June 4, 1992, the ALJ found that the Hospital violated Section 8(a)(1) of the Act by adopting and disparately enforcing its bulletin board posting rules, mailbox policies, and employee "button" rules.
 
 
 49
 The ALJ also held that the Hospital violated Section 8(a)(1) of the Act by promulgating and selectively enforcing the off-duty access rule; by promulgating and selectively enforcing the solicitation and distribution rule; and by engaging in surveillance of employees' Union activities. As to the discharge of RN Katherine Richardson, the ALJ determined that the Hospital violated Section 8(a)(3) and (1) of the Act (29 U.S.C. Sec. 158(a)(3) and (1)) by terminating her because of her Union activities. The Hospital appealed all of the above findings to the Board.
 
 
 50
 On January 29, 1993, the Board, adopting the ALJ's order, affirmed the decision. The Board's order required the Hospital to rescind disciplinary warnings issued to numerous employees because of their Union activities; to rescind its rules prohibiting distribution of literature in employee mailboxes and the access of off-duty employees to Hospital property; to rescind its revised personal appearance policy to the extent that it prohibits Hospital employees from wearing Union insignia on their uniforms; to offer employee Richardson immediate and full reinstatement to her former position, and to make her whole for any loss of earnings or other benefits she suffered as a result of the discrimination against her; and to post an appropriate notice indicating compliance with the above order.
 
 
 51
 The Hospital appeals the Board's order as to the off-duty access rule; the solicitation and distribution rule; the Hospital's surveillance activities; and the discharge of Richardson. It does not appeal the determinations regarding the bulletin board rule; the mailbox rule; or the personal appearance rule. The Board filed a cross-application for enforcement of its order. The District of Columbia Nurses Association has filed an Intervenor's Brief in support of the Board's position.
 
 II
 
 52
 If the Board's findings and conclusions are supported by substantial evidence taken from the record as a whole, the reviewing court should not disturb the Board's order. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); NLRB v. Kiawah Island Co., 650 F.2d 485, 489 (4th Cir.1981); Act Sec. 10(e), 29 U.S.C. Sec. 160(e). We must uphold a Board's conclusions of law if based upon a reasonably defensible construction of the Act. NLRB v. United Food & Commercial Workers, Local 23, 484 U.S. 112 (1987). A reviewing court "may not displace the Board's choice between two fairly conflicting views even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera, 340 U.S. at 488. See ARA Leisure Servs., Inc. v. NLRB, 782 F.2d 456, 459 (4th Cir.1986); NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir.1985). Whether the findings of fact are supported by substantial evidence is a question of law for the court to decide. Universal Camera, 340 U.S. at 491.
 
 III
 
 53
 Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights to join or support Union activities. We evaluate the coercive or intimidating nature of the employer's actions under the totality of the circumstances. See Nueva, 761 F.2d at 965. In light of the above standard, we affirm the Board's conclusion that the Hospital violated Section 8(a)(1) of the Act by disparately enforcing its solicitation and distribution rule.
 
 
 54
 Under Section 8(c) of the Act, employers have the legal right to express their views concerning a Union's organizing efforts so long as the opinions do not involve threats or coercion. An employer does not violate the Act by enforcing a valid no solicitation rule pertaining to on-duty employees while engaging in antiunion solicitation of its own. NLRB v. United Steelworkers of Am., CIO (Nutone, Inc.), 357 U.S. 357, 362 (1958); Lutheran Hosp. of Milwaukee, 224 NLRB 176, 181 (1986), modified on other grounds, 569 F.2d 208 (7th Cir.1977).
 
 
 55
 Employees, however, also have "the right to self-organization and collective bargaining established by [Section 7] of the Act. [This right] necessarily encompasses the right of employees effectively to communicate with one another regarding self-organization on the job site." Beth Israel Hosp. v. NLRB, 437 U.S. 483, 492 (1978). Generally, employers cannot adopt rules prohibiting solicitation or distribution on nonworking time. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803-04 (1945). In the context of a hospital, however, the Board has permitted more restrictions on employee solicitation and distribution because of problems with disruption of patient care. For example, a hospital may ban all solicitation and distribution in immediate patient care areas. A rule, however, that prohibits distribution or solicitation on nonwork time in nonworking areas is presumptively invalid unless the hospital demonstrates that the prohibition is necessary to avoid disruption of health care operations or disturbance of patients. Beth Israel, 437 U.S. at 491. The rule cannot be overly broad. NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 781 (1979). The hospital bears the burden of proving that the prohibition is necessary to lessen disruption to patients. Id. at 507. See Southern Maryland Hospital, 916 F.2d 932 (4th Cir.1990) (enforcing order requiring Hospital to allow distribution and solicitation at entrance doors in early morning hours).
 
 
 56
 The Hospital contends that the Board erroneously held that the Hospital's antiunion solicitation in areas barred to prounion solicitation violated Section 8(a)(1). We disagree. The Hospital's antiunion solicitation in areas barred to Union sympathizers[11] indicates that the Hospital never needed to apply the rule in those areas. If the Hospital had merely allowed noncontroversial solicitation, such as Tupperware sales, in these areas, a different result may, but not necessarily, have been dictated. In light of the Hospital's antiunion activity in banned areas, however, the hospital has not met its burden of proving that the prohibition on solicitation is necessary to lessen disruption to patients. See Beth Israel, 437 U.S. at 507. In other words, the Hospital's no solicitation/distribution rule does not meet the"justification" requirement set forth in Beth Israel: the hospital knew that no disruption of patient care would occur from solicitation in banned areas, such as the nurses' stations. Consequently, because the Hospital's rule violates Section 8(a)(1) of the Act, we cannot allow the Hospital to continue excluding prounion solicitation in the previously forbidden areas.
 
 
 57
 The Hospital also takes issue with the Board's finding that it allowed employees to solicit for and distribute materials about numerous activities in "banned" areas while disciplining Union organizers for the same behavior. Claiming that all of these other solicitations were hospital related, the Hospital argues that they cannot be relied upon to support an allegation of disparate enforcement. Rochester Gen. Hosp., 234 NLRB 253, 259 (1978). We disagree. As the Board points out, the Hospital mischaracterizes the evidence: the Hospital allowed the sale of many nonhospital-related commercial products including Avon, Tupperware, and Girl Scout Cookies, in banned areas. Moreover, nurses were told to cease bringing Union material to the building; others were prohibited from distributing Union material in nurses' lounges, even though the rule allowed distribution in nurses' lounges. These prohibitions did not apply to nonunion products and activities.
 
 
 58
 Therefore, the Hospital's maintenance and enforcement of its no solicitation/no distribution rule violated Section 8(a)(1) of the Act. By its actions, the Hospital demonstrated there was no need for the rule. More importantly, the Hospital disparately applied the Rule. Thus, the Board's decision regarding the Hospital's no solicitation/no distribution rule merits enforcement.
 
 IV
 
 59
 Section 8(a)(3) of the Act (29 U.S.C. Sec. 158(a)(3)) prohibits employer "discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." Thus, an employer violates Section 8(a)(3) and (1) of the Act by discharging an employee for engaging in activities in support of union representation. See, e.g., N.L.R.B. v. Frigid Storage, Inc., 934 F.2d 506, 509-10 (4th Cir.1991); Salem Leasing Corp. v. N.L.R.B., 774 F.2d 85, 89 (4th Cir.1985). Section 8(a)(3) and (1) violations are subject to a two-tiered analysis. First, an employee may not be discharged for engaging in conduct protected by Section 7.[12] Leasco, Inc. v. N.L.R.B., 289 NLRB 549 n.1 (1988). To remove conduct from the protection of the Act, a court must find the conduct to be "egregious" or "of such a character as to render the employee unfit for further service." Id. at 549. The Board employed this standard in the instant case to find the conduct protected. See Brunswick Food and Drug, 284 NLRB 661, 665 (1987), enforced mem., 859 F.2d 927 (11th Cir.1988).
 
 
 60
 Even if the employee's conduct is not protected, however, a discharge motivated by antiunion animus violates the Act. Nueva Eng'g, 761 F.2d at 966. Under this tier of the test, the employee must establish two elements: (1) that antiunion animus was a substantial factor in the discharge, NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 400 (1983), and (2) that the discharge would not have occurred but for the antiunion animus. Id. at 967. See Wright Line, 251 NLRB 1083 (1980), enforced as modified, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982); approved in Transportation Mgmt Corp., 462 U.S. 393 (1983).
 
 
 61
 Under Wright Line, once a court finds antiunion animus to be a motivating factor, the burden shifts to the employer to prove by a preponderance of the evidence that the discharge would have occurred even without the protected conduct. Transportation Mgmt. Corp., 462 U.S. at 400-03. Accord Salem Leasing Corp., 744 F.2d at 87-88; NLRB v. Daniel Construction Co., 731 F.2d 191, 197 (4th Cir.1984). Motive is usually the main question to be resolved. N.L.R.B. v. Hale Container, 943 F.2d 394, 398 (4th Cir.1991). Because the question of motive is a question of fact, we cannot disturb the Board's determination unless it is not supported by substantial evidence based on the record as a whole. Nueva Eng'g, 761 F.2d at 968. Applying this standard, we affirm the Board's finding that Richardson's discharge violated Section 8(a)(3) and (1) of the Act.
 
 
 62
 The Hospital's argument against the Board's finding of a violation is two-fold. First, it asserts that Richardson's conduct was unprotected. In the alternative, the Hospital argues that the discharge was not motivated by antiunion animus. We consider each argument in turn.
 
 
 63
 * Contending that the Board incorrectly employs an"egregiousness" standard to find Richardson's activity protected, the Hospital argues that Richardson's speech does not fall within the bounds of protected activity. We disagree. In Leasco, the Board upheld the egregiousness standard for distinguishing conduct which the Act would not protect. 289 NLRB 549 (1988). The cases cited by the Hospital do not prove otherwise. Atlantic Steel Co., 245 NLRB 814 (1979); Golden Nugget, Inc., 215 NLRB 50 (1974). In fact, Golden Nugget predates numerous cases employing the "egregiousness" test. See Brunswick Food, 284 NLRB at 665; Postal Service, 250 NLRB 4 (1980).
 
 
 64
 The Hospital also relies on Atlantic Steel to argue that Richardson's conduct was unprotected. We find no merit in this argument. In Atlantic Steel, the Board set forth several factors for determining when an employee's conduct is sufficiently severe to lose the protection of the Act: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practice. 245 NLRB at 816.
 
 
 65
 Although the Atlantic Steel Board held that a shop steward's use of profanity towards his supervisor removed him from the protection of the Act, id. at 814, that case is distinguishable from the instant case. The obscenity directed at the foreman in that case was completely unprovoked and occurred on the production floor during the employee's working time. Id. at 816. In contrast, Richardson's remark did not involve profanity, was provoked by conversation about the Union, and was uttered on her break. Thus, even applying the factors from Atlantic Steel, Richardson's statement does not lose the protection of the Act.
 
 B
 
 66
 In its alternative argument, the Hospital challenges the Board's holding that, even if Richardson's conduct were unprotected, the Hospital still violated the Act because antiunion animus motivated the discharge. We find this argument to be without merit.
 
 
 67
 Fairfax first argues that the Board erroneously relied on the Hospital's other Section 8(a)(1) violations to find antiunion animus. The Hospital contends that such circumstantial evidence may be used only where violations are egregious. This argument is unpersuasive. We have held that "motive is a question of fact" and that "the Board may infer discriminatory motivation from either direct or circumstantial evidence." Nueva Eng'g, 761 F.2d at 967. See also Frigid Storage, 934 F.2d at 510 (finding retaliatory motive from numerous uncontested violations); American Thread Co. v. NLRB, 631 F.2d 316, 321 (4th Cir.1980); Gencorp, 294 NLRB 717 n.1 (1989). None of these cases limits circumstantial evidence of motive to egregious violations.
 
 
 68
 Moreover, because motive is a question of fact, we must accept the Board's finding of antiunion animus if there is substantial support for it on the record as a whole. Salem Leasing, 774 F.2d at 89. In this case, substantial evidence of an antiunion motive exists: Richardson had an exemplary employment record, sixteen years of experience at the Hospital, and consistently excellent evaluations. Yet she was fired, without warning, for her retaliation comment made during a conversation about the Union. Consequently, we will not disturb the Board's finding of antiunion animus.
 
 
 69
 Next, the Hospital argues that, even if the General Counsel has established a prima facie case of antiunion motivation, the Hospital has proven by a preponderance of the evidence that Richardson would have been fired anyway. Pointing to its "good faith belief" that the retaliation comment was a severe threat, the Hospital contends that Richardson would have been discharged for her remark regardless of antiunion sentiment.
 
 
 70
 The Board, however, adopted the ALJ's credibility determinations that the reason advanced by the Hospital for Richardson's discharge was not credible[13] and that, in any event, the Hospital "failed to follow its own progressive discipline policy in its discharge of Richardson."[14] (J.A. 82). Considering Richardson's exemplary record, her noted Union activity, and the Hospital's failure to follow standard disciplinary procedure, we must conclude that substantial evidence exists to support the Board's conclusion that the Hospital's explanation for Richardson's discharge was mere pretext.
 
 
 71
 Therefore, the Hospital's discharge of RN Richardson violated Section 8(a)(3) and (1) of the Act. Richardson's activity was protected. Even if it was not, the evidence establishes that antiunion animus motivated the discharge. Consequently, because we find that substantial evidence on the record as a whole supports the Board's findings, the Board's order is enforced with respect to Richardson.
 
 V
 
 72
 The Hospital raises numerous arguments in an attempt to prevent enforcement of the Board's order with respect to the Hospital's surveillance of Union activities and the Off-Duty Access Rule. We find that the Hospital's contentions are without merit. Accordingly, we also grant enforcement as to these portions of the Board's order.
 
 VI
 
 73
 We find that substantial evidence exists to support the Board's finding of violations of Section 8(a)(1) and (3). Accordingly, enforcement of the NLRB's order is granted.
 
 ENFORCEMENT GRANTED
 
 
 [1]
 This rule provided as follows:
 STATEMENT
 Bulletin boards located at various places throughout the organization are for the official use of Fairfax Hospital Association. However, each facility may designate one bulletin board for employees' use within stated parameters.
 GUIDELINES
 A. Bulletin Boards: All bulletin boards of the Association are restricted to the posting of Association-designated documents and notices.
 B. Employee Bulletin Board: Each facility may designate one bulletin board for the use of employees. Employees will be permitted to post personal announcements, such as car-pool information, for-sale advertisements, and apartment sharing. Commercial notices, for example, advertising for real estate agencies, political notices, church events, and other such solicitations are prohibited.
 Items to be posted must be delivered to the facility personnel office for approval prior to posting. The size of the announcements may not exceed 3" X 5." Notices may be posted for a period not exceeding one calendar week. Notices found on the Employee Bulletin Board without approval of the personnel office will be removed immediately.
 Posted material found anywhere other than the designated bulletin board will be removed immediately.
 C. Special Requests: Special requests for authority to post notices of events in the community by charitable groups, various professional associations and the like shall be submitted to the Director of Personnel. The Director of Personnel will convey the request to the facility Vice President/Administrator for consideration. Normally, only those requests to post notices which involve health, medical, patient care or similar subjects may be approved.
 (J.A. 46-47).
 
 
 [2]
 STATEMENT
 Off-duty employees are not allowed to return to, or to enter, the Hospital's physical property or premises unless to visit a patient, receive medical treatment or to conduct hospital-related business.
 GUIDELINES
 A. An off-duty employee is defined as an employee who has completed his/her normally scheduled shift.
 B. Hospital-related business is defined as the pursuit of the employee's normal duties or duties as specifically directed by management. C. Special exceptions to this policy will require the prior approval of the appropriate assistant/associate administrator and the director of personnel.
 (J.A. 1292).
 
 
 [3]
 Although Fairfax contends that it placed its new no-access rule in the policy books, the rule was never announced at staff meetings
 
 
 [4]
 Patient care areas included patient rooms; operating and recovery rooms; nurse's stations; rooms where patients receive treatment, such as treatment rooms of the emergency department, radiology, and therapy rooms; corridors adjacent to patient rooms, operating and recovery rooms, treatment rooms; sitting rooms on patient floors accessible to and used by patients; elevators or stairways used frequently to transport patients; and locker areas adjacent to patient care areas
 
 
 [5]
 These activities included book sales, shoe sales, and craft fairs
 
 
 [6]
 The following items, among others, were sold in patient care areas: Tupperware, Avon products, Girl Scout cookies, candy bars, citrus fruit, Easter baskets, flowers, plants, tote bags, T-shirts, Christmas cards, wrapping papers, and ribbons. (J.A. 105-06, 146-50, 340-41, 398, 40002, 699-702, 724-25, S.A. 84, 101, 164)
 
 
 [7]
 Numerous witnesses testified to this fact. Several of the witnesses who admitted handing out the material in patient care areas were witnesses for the Hospital. (J.A. 1042-44, 1135-40, S.A. 23-24)
 
 
 [8]
 On one occasion, however, a nursing coordinator asked some nurses to leave the nurses' station and return to an area off the nurses' lounge so that patients would not overhear their antiunion discussion. (J.A. 1020)
 
 
 [9]
 The contents of the statement are as follows:
 
 
 [1]
 There was an emotional conversation about posting of hospital posters vs. what Kitty wanted to post
 
 
 [2]
 Kitty Richardson--got highly emotional
 
 
 [3]
 The emotion may be due to anger or frustration, I'm not sure. She was venting
 
 
 [4]
 There was a 10 minute conversation in which Kitty Richardson's emotional state escalated
 
 
 [5]
 I heard something to the effect of you will see some retaliation
 (J.A. 1502).
 
 
 [10]
 These violations include "tardiness, absenteeism, poor work performance, disregard for sanitation and safety rules, failure to follow instructions, procedures or standards, disruption of the routine of others, improper care of equipment and hospital property and inappropriate behavior towards patients, guests, employees and physicians." (J.A. 1329)
 
 
 [11]
 Although it is unclear from both the ALJ's and the Board's opinion whether the Hospital actually engaged in antiunion solicitation and distribution in patient care areas and in other banned areas, a closer examination of the record indicates that the Hospital did participate in these antiunion activities in both areas. (J.A. 141-45, 146-50, 174-76, 308-18, 436-39, 656-58, 679-80, 692-93, 705, 738, 1020, 1042-44, 1135-40, 1189-90; S.A. 23-24)
 
 
 [12]
 Section 7 of the Act grants employees the "right to self-organize, to form, join, or assist labor organizations, ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection." 29 U.S.C. Sec. 157. A violation of Sec. 8(a)(3) includes a derivative violation of Sec. 8(a)(1). Metropolitan Edison Company v. NLRB, 460 U.S. 693 (1983)
 
 
 [13]
 The ALJ and the Board found the Hospital's witnesses who testified to the good faith belief in the severity of the threat and to the severity of Nurse Booth's reaction to be insincere. (J.A. 109)
 Credibility determinations are conclusive unless a clear preponderance of all the relevant evidence shows they are incorrect. Standard Dry Wall Products, 91 NLRB 544 (1950), enforced, 188 F.2d 362 (3d Cir.1951).
 
 
 [14]
 The Hospital's written policy provides for factfinding, oral and written reminders, and a day of decision-making leave prior to discharge. Even for serious offenses warranting immediate discharge, the policy provides that the employee will be suspended while the facts of the offense and the appropriate discipline are fully investigated
 Clearly, the Hospital did not follow its standard procedure in terminating Richardson. Although the Hospital argues that it terminated other employees without following its standard procedure, none of these situations is analogous to the instant case. All of the other incidents involved either violent behavior--knives and physical fighting--or repeat violations coupled with direct refusal to follow instructions.